All right, our final case for argument today is 25-1050, Mr. Bonojo v. DHS. Counsel, how do I say your last name? Zakai. Mr. Zakai, please proceed. Thank you, Your Honor. Chief Judge, Your Honors, may it please the Court, my name is Howard Zakai on behalf of Mr. Bonojo. We ask this Court to vacate the Board's decision. Our first point is that the Board failed to apply the proper legal analysis for assertions of self-defense. The MSPB has stated it considers self-defense claims in the course of deciding whether the agency has proven a charge, in this case conduct unbecoming or similarly some sort of assault. The question is whether the employee used only so much force as was reasonably necessary under the particular circumstances. And this Court in fuller, albeit an unpublished decision, set forth a number of factors to be considered as part of that analysis. Neither the initial decision nor the final order even references self-defense or justification, let alone analyzes all of those factors set forth in fuller that goes into the analysis. Amount of force. What if we were to read the AJ's decision as essentially taking into account Mr. Bonojo's self-defense allegation when the AJ said, you know, even taking his version of events into account, the AJ felt that his actions here were just not reasonable and that he should have been able to find other means to de-escalate the situation. And so let's assume for the moment that the AJ really did accept his side of the story, but just still nevertheless found the biting to be unchanged. Your Honor, those two references to the AJ's decision, those premises. First, biting was not a taught law enforcement technique. That's not the standard. And one of the reasons why we know that is that the agency's own use of force policy, it's in our brief at page 36, on page four of policy, references exigent circumstances and speaks explicitly to the fact that officers are authorized to use any available object or technique so long as it's reasonable. OK? So the fact, the premise that biting itself is not a law enforcement technique, it cannot be dispositive. It's not necessarily unreasonable. The other point, Your Honor, that he could have used, quote, other means. That also is not the standard. There have to be other reasonable, less forceful means. And here, all those other means at that point where that regrettable bite is inflicted, all other means at that point had failed, right? It started with verbal demands. She's not complying. Now she's on top of him on the bed. He manages to, with his hand, make a phone call to the police. Now she's enraged. He escapes momentarily. OK? He runs to the door. She catches him because he had to first open the door. Now she's pulling on it, pulling on his waistband where the firearm on his right side is fastened. And now he's really scared. OK? So she's pulling on his waistband. How then did he bite? I'd like you to literally explain to me, perhaps even reenact for me, how it is that he bit her forearm, upper bicep, when she's pulling on his waistband. Because I've been struggling to try to understand exactly how this happened. The record does not speak to that. It would be difficult for me. I could speculate that her entirety, I suspect, that not there. But the record doesn't speak to it. But all of the things you just described were before the AJ when they made this decision. And the AJ said that he did not think biting her bicep was reasonable under the circumstances. And I'd have to decide whether there's substantial evidence in the record for that. So he pushes her onto the bed. That's in the evidence. He's able to make a phone call while that's taking place. Then he's leaving. And she's, I don't know, he thinks, reaching for the waistband or something. But just out of curiosity, does he lean over and bite her? How does this biting occur? I am struggling. If he had said, she put me in a choke lock, and I had no choice but to get her arm off of me by biting, maybe the AJ would have said, under those circumstances, biting was reasonable. But under the circumstances that he has articulated, the AJ said, I think there are a lot of other things he could have done. So I feel like the onus is on you to demonstrate why that was a reasonable exercise. Because I think you have not proven to me any set of facts which makes me think that the AJ should be overturned on a question of fact, a question of reasonableness, in light of the particular nature of the altercation. I don't think the AJ said, and I don't read the AJ's opinion as saying that a police officer could never bite somebody. Like, I don't see it as a broad statement. But I see the AJ's opinion saying, this was not reasonable in these circumstances. And that's a high burden for me to overturn that. So explain it. Demonstrate it. Give me something in this record that shows me why it was, in fact, not supported by substantial evidence, the conclusion that that was not reasonable. So the record does speak to the fact that it's not that the only thing that she's doing is pulling him, OK? She's grabbing him. The record doesn't say specifically in what ways. But it's pretty clear that it's not limited to just pulling on his waistband from a distance. It also doesn't say something like, the woman's a beast. This woman is 250 pounds and does CrossFit daily. And this man is small. Like, there's just nothing in this record that gives me, I mean, biting is weird. It is not a normal police officer response. I've never had a case. I've never heard of a police officer biting someone. Now, but, like I said, if you could establish a set of circumstances, she had him in a headlock. It was the only way. Like, if you had put something on the record that showed, then I would say, you know, I think there is a lack of substantial evidence to support this fact-finding. But you haven't introduced into this record any facts that makes a not normal defensive tactic seem reasonable to the point where there wasn't substantial evidence for a fact-finder to conclude to the contrary. And, Your Honor, he does speak about being grabbed and pulled. So it wasn't just that specifically she's pulling from a distance. I think that, you know, even if she were pulling from a distance, how he got around to biting, I don't know. Her upper arm. Like, that's the other thing. Like, not the hand. Was it the bicep? Was it the shoulder? So it's probably close to the deltoid. At one point, they call it the upper arm. Another point, the shoulder. It's the upper arm. Deltoid. Probably the deltoid. Now, it appears to be about the same size, or is he? I don't know. And that's not in the record. But if even she's pulling from a distance and he has to go around to break free, OK, what are his other options? Is he going to strike her? That's going to use a lot more force. It might even hurt her much more than a bite that eventually went away, both regrettable. He doesn't want to throw her. He doesn't want to flip her, in that in the exigency of the circumstances, he doesn't want her to get to the firearm. He doesn't want it to dislodge. That's what. Is there evidence in this record that she was reaching for the firearm?  Not intentionally, but he said several times, 835 Appendix and the pages surrounding, that he felt her pulling on the firearm. He felt that the waistband was going to rip. That's how forceful. But he was able to push her away to make a phone call. Like, I mean, he can. Yeah, while on the bed. It's clear that in the beginning, she's on top of him on the bed. I think while she's on top of him, he's able to get a phone call off with a hand. He's able to run off the bed. He gets to the door. He has to first open it. She catches up with him. That's where now she's pulling. She's more enraged than she's pulling on the waistband. And I don't want to gloss over the phone call. It's made somehow in the scrum from the bed. But the phone call is successful in alerting law enforcement such that they dispatch multiple units to the house, right? Yes. There has to be substantive information conveyed. So information was conveyed. He gets to the door. She's pulling. He's scared, bites, breaks free, gets downstairs or to the front door of the house. Now she's pulling on him again. It's at that point. He's on the phone again. And it just so happened that the dispatch officers were coming up. And that's when they got in and they separated them. Your Honors, if I could turn to the second point. Before you do that, counsel, if I could, I want to come back to something Judge Chen asked. Because my concern, even if Fuller is not stated and there's not a full cite, should this court require an AJ to specifically say magic words in order to survive appellate review under the deferential standard we have here, as the Chief Judge noted, when all the factors are discussed by the AJ? The factors are discussed. I don't think, especially in light of the multiple court cases that speak about whether self-defense is proven or it's part of whether the agency proves. I think it needs to be articulated. I think there needs to be a notice that, hey, he has claimed self-defense. Is this proven that he did this without justification? Was – were there other means that were less forceful and more reasonable? And that analysis is not there. So I do think, to answer your question, that should go into – explicitly into the analysis. Because we're short on time, I wanted to go to the other argument with respect to the privilege against self-incrimination. I think that, you know, on one hand, when Mr. Bonoggia appeared for his OPR interview regarding the incident underlying the arrest, he's given his capitalist warnings and he readily acknowledges. I bet my wife, it was a difficult situation. Okay. The issue that's going on here, for purposes of our appeal in juxtaposition, is the agency violates its obligations under Calcuinus and Garrity, whereas here the employee is – we have in the testimony, he's required to speak to his supervisors about the details of the incident underlying the arrest in the middle of that arrest, and in the presence, even worse, in the presence of those officers and then disciplines him regarding that response to the requirement. Now, the Board found that this was an official matter. Okay. So that necessarily implicates one's employment future. The agency's own policies don't differentiate the requirement to be juxtaposed. Was this raised below to the AJ or the Board? The – the fact – I looked at the sites and it's not very clear to me that this was the – there    So this is a Weingarten reference, but not Calcuinus and – or Garrity. I know that – we were not counsel below – that for sure Calcuinus, Weingarten, Garrity were all specifically referenced in the briefing below, making the point that he was not given those protections. The initial argument was if this was not a formal – this was not an investigation at all, it's not material, therefore, he shouldn't be disciplined for anything. Well, that's the argument that I saw below. I didn't see your current argument that – Well, what happened was, Your Honor, the Board comes out and says it's an official matter. Yes. Yes. That investigation's an official matter. And that has its own import and legal implications because if it's an official matter, okay, whether investigation, official matter, official inquiry, Calcuinus and Garrity have to be given before the response in that situation is used against him in discipline, okay? I'm not sure. I'm reading on page 35 of the appendix that when this took place, Mr. Judy was not conducting an investigation. So I don't understand your official matter thing. The – in two places, the Board says that he uttered these statements when there was no investigation into him at the time. So I don't get that this was some official matter where they had to read him his rights. Well, but the point, Your Honor, respectfully, is that it doesn't need to be an investigation. It's an official matter. The requirement of truthfulness under the Employee Code of Conduct speaks about official matters, official inquiries, and investigations, lumping them all in. So if it's an official matter, if his responses to that, in that, are going to be used against him, coupled with the potential for self-incrimination as we have here, that's automatic since the police are right there. They're talking about his arrest. So if there is an official matter, if there is an official matter, if there is an official matter, then those two scenarios combined create a garrity, calculus situation. Now, once they administer the warnings, I don't know if they could here, given the location of the officers, but once they give him the warrant, then absolutely, he has – there is no right to lie whatsoever, okay, because the dilemma is taken away. There is no right to lie, period. Yeah, where in any case is there the right to lie? There is no – so it's not the right to lie, right? Right. It's the right to remain silent. Respectfully, no, Your Honor. Qualified. In Garrity and Miranda situations, those are the two – I see that my time is up. May I finish answering the question? Okay. When Garrity came out with its decision, it cited Miranda, okay, explicitly. And obviously, the corollary there in Miranda's custodial indemnifications here, it's where there's the dilemma of employment or self-incrimination. And it said, these are the instances where no matter what you say, they literally said explicitly, inculpatory or exculpatory statements cannot be used without the warnings. And those are the two instances, Miranda and Garrity. So I – Those are criminal proceedings, right? No. In Garrity, it was not about a criminal proceeding. It's talking about the inherently compelled statements regardless of the use in a criminal case. It's about the discipline. But was this inherently compelled? The first – the first lie is during a phone call in the immediate aftermath of the domestic situation. Yes. So – and by – she even testified that he's required to report, right? Sure. Okay. But he volunteers. My wife bit herself. It's not clear if he volunteered. However, and he might have – the record is not clear. But if he thought, and if we have testimony at 705, that he's required to report the details of the incident, which inherently is – could be self-incriminating, then it doesn't matter. If she wants to give him a calculus of Garrity warnings, then that – that removes the issue. Okay. Let's have him with government. Good morning, Your Honors. May it please the Court. The Board's decision in this case should be affirmed because it is supported by substantial evidence and is otherwise in accordance with the law. We have three overarching issues in this case. First, the conduct on becoming a law enforcement officer charge. Second, the lack of candor charge. And third, the reasonableness of the mitigated penalty. I will address each of these in turn. Substantial evidence supports the Board's decision sustaining Mr. Bonoggio's conduct on becoming a law enforcement officer charge, and I think it would be helpful to direct the Court to certain areas in the record that may be helpful for the questions presented to my friend on the other side. In Mr. Bonoggio's hearing testimony, he states at Appendix 852 that his wife was not going for his son. Did you say that was 852, Counsel? Yes. And I believe there was also a question about the heights and weights of Mr. Bonoggio and his wife. That is also in the record. At 364 and 368, those are police records, and they indicate that Mr. Bonoggio is 5'9 and 190 pounds, and that Ms. Bonoggio is 5'8 and 160 pounds. So this was not a situation in which Ms. Bonoggio was much larger and stronger than Mr. Bonoggio. In addition, the Court asked about the exact location of the bite mark. There's a photo of that in the police record as well. That's on Appendix 360, which shows the bite mark up here. And in addition, under this Court's decision in O'Neill v. Department of Housing and Urban Development, that's 220 F3D 1354, at page 1364, an administrative judge need not make an explicit finding, in that case a finding of nexus, if the finding was implicit in the administrative judge's decision. In this case, the implicit finding on self-defense is the statement that even if one accepts Mr. Bonoggio's version of events, biting was not a reasonable tactic. In addition, on Appendix, I'm sorry, I went a little out of order. I forgot one of my record sites for you. On Appendix 872, Mr. Bonoggio states that he elected to bite rather than use his hands, which would have been another means in order to defend himself. Moving on to the lack of candor charge, Mr. Bonoggio's Fifth Amendment arguments are waived because he failed to raise them with sufficient specificity and clarity below the citations in the response brief, do not show otherwise. They really come in two categories. The first category would be Appendix Sites 800 and, sorry, 686 to 93, and 901 to 908. Those are Mr. Bonoggio's arguments that his statements to his supervisor were not material because they were not provided in an investigatory setting, say in Weingarten. There are no citations to Garrity or Kalkines on those pages. Can you tell me what page that was in the journal? Yes. 686 to 93, and 901 to 08. And then the second category would be at Appendix Sites 722 to 23, and 841 to 42. And those were questions by Mr. Bonoggio's counsel below during the hearing in front of the administrative judge. And they asked whether Mr. Bonoggio received any of Weingarten, Garrity, or Kalkines' warnings. And all of the follow-up questions were about whether there was an official type of inquiry, whether he received a union representative, and whether the conversation was casual. So what do we do about his argument that this was, it did not occur during an investigation, the board made that clear. On page 33 of the opinion, I think that's where the ICE Code of Conduct provides for the requirement of truthfulness. Yes. And it says truthfulness in all official matters. What's the government's argument as to how this was in fact an official matter, or is your argument that there is a truthfulness requirement beyond this particular provision? Our argument in this case is that there was a truthfulness requirement when speaking to a supervisor about an additional matter. I'm not aware of the agency's position on other circumstances. So are you conceding that the provision I just read on page 33, which talks about truthfulness in official matters, are you conceding that this was not an official matter, and so that's not the provision that governs this case? No. Our position is that this was an official matter, but it was not a formal investigation, an informal investigatory setting into Mr. Bonoggio's misconduct. The ICE Code of Conduct... How was it an official matter? What was... Yeah. What were the circumstances that make it such that it was an official matter? The ICE Code of Conduct, which starts at Appendix 395, provides... And the ICE Code of Conduct applies on and off duty. That's stated on 395. And it also states that it does not prohibit conduct protected by federal law. And then on 396, the code provides that supervisors must notify OPR of employee arrests. And on 397 and 400, it states that employees must report arrests. And in the first-line supervisor, Ms. White's, hearing testimony, she explained this policy further. At Appendix 705, she explained that employees must report arrests to their first-line supervisor because the incident will need to be investigated. The pertinent information is what occurred and what is going to happen next. And the reason they need this information is that first-line supervisors need to know what to do. For example, securing the weapon and reporting to a second-line supervisor and to OPR. And that's on 705. To 06, and that's the reason that she was on the phone, to gather his credentials, gather his firearm, and then further proceedings into any misconduct would occur later. So what is your argument as to why she did not have an obligation to give him these, I'm just going to call them Miranda-like, warnings? Even in the Miranda case, you need a custodial interrogation. So the mere fact that you're in a situation where you might say something self-incriminating is not alone sufficient. In Garrity and Kalkine's, there was a formal investigatory setting. And in addition, there are other reasons that this case is distinguishable from Garrity and Kalkine's. For example, there was no threat of losing his job for failing to speak, not express, and not in the policy. As I stated, the policy provides that it doesn't abridge his rights. In addition, it's distinguishable because he voluntarily chose to speak to his  And in Mr. Bonojo's hearing testimony, he describes the conversation with his supervisor at 837 to 39. And in that part, he said that his supervisor said, what happened? And then he said what happened. The first line supervisor asked, who was there? He responded that the police were there. She spoke to the sergeant and then told Mr. Bonojo that somebody would collect his gun and credentials. And then on 860 to 861 in the appendix, Mr. Bonojo testified that he was not asked by his first line supervisor what his arrest was for. So the exclusive purpose was not to investigate misconduct. It was to secure his firearm and initiate further proceedings. Let me ask you this, because we have this official matter issue, and that is set forth in the ICE code of conduct. But then this extra layer of employee protection, once an investigation starts, right, as a chief judge called them, the Miranda-like warnings that are required. Is it the government's position that this case falls in the gray area between the two? Because I have a difficult time squaring the notion that this initial phone call was not an official matter, because it's clearly required that if you are arrested, detained, et cetera, that must be reported. But it also strikes me that the government's position is an investigation had not yet begun, because it was basically an initial intake call of information. Such as you said, it has to be elevated to a second level supervisor of, what the heck do we do with this? Yes. So I guess my question is, what should this court do, if anything, about this area that exists between official matter and official investigation? In this case, there are two sets of statements, right? The statements on the day in question, the day of the arrest, and then the statements at the follow-up interview with OPR. It is in the record that Mr. Bonojo received various warnings before his OPR investigation. That's at appendix 286. And our position is that there's a difference between this mere intake, where he did not necessarily need to give any self-incriminating statements or necessarily any statements that would lead to his discipline. Only enough so that the first-line supervisor would know what to do next. So that's the one. And so, I guess, is the government's argument that it was an official matter because a person had to go to the precinct to retrieve his gun. Like, that is official. If someone has to come and retrieve the property, that's an official act. But that there was no obligation on his part to explain what happened to that individual. He did not need to explain what happened beyond that he was being arrested for what and where he was going to go, which he did tell his supervisor. And there were no questions asking him about the details of the interaction between himself and his wife on that day. In addition, even if this court were to conclude that Garrity or Kalkine's warnings should have been given in that initial phone call, it wouldn't change the outcome here because there is no right to lie. And the Supreme Court has said this in La Chance versus Erickson. That's 522 U.S. 262. It's from 1998. And in that case, the court held that the due process clause does not preclude an agency from sanctioning an employee for making false statements regarding alleged misconduct. That's on page 264. And then in an unpublished decision, this court said, in Dela Pena versus the MSPB 409 FAPPX 332, that's from 2010. It cited La Chance versus Erickson. And in that case, the petitioner argued that the board improperly relied on false statements coerced by threat of removal. And the court observed that the petitioner could, one, not answer, two, tell the truth, or three, lie. And that by choosing to lie, and that the threat of termination was irrelevant because the petitioner in that case chose to lie. That's on page 335 of that decision. And it should be the same conclusion here. And even in the criminal context, one could still bring a charge for perjury, even if Miranda warnings were not given. And that's stated in Melanne Conn. I guess what you're saying is the proper thing for Mr. Bonoggio to have done when asked by his supervisors what happened would be to remain silent. Yes. As opposed to lying and saying that the lady bit herself. Yes. And when it comes to Garrity and Kalkines, they don't cover this kind of scenario where someone lies and then that lie is being used in an administrative proceeding, not a criminal proceeding. That's correct. And lastly, in terms of the reasonableness of the mitigated penalty, this was the penalty of mitigated penalty of reinstatement to a non-law enforcement position was not clearly excessive or an abuse of discretion. Anything further? No, we respectfully request that the court affirm the board's decision. Okay. Well, we have some rebuttal time, but I'm going to just take a moment to say it's been a long time since I've seen somebody as fluid with the record as you were. So good for you. Thank you, Your Honors. Three, if I can, brief points for rebuttal. First, Appendix 852, that the wife was not going for the gun, I think that is meant, and I'll explain why in a minute, that was meant that she was not intentionally trying to get the gun to use it. If you look at Appendix 835, it states very clearly, I actually felt her pulling on my firearm and therefore he was scared that it was going to dislodge inadvertently and cause a grave harm. About what the reference of using the hands instead, if I may, I submit that using his hands could have inflicted more injury than it actually did. Probably less unorthodox, surely, but it may not have necessarily been more reasonable and probably would have used more force. The second point, there was a discussion about the setting. The setting in which someone invokes or is thrown into an involuntary, inherently involuntary situation, the Supreme Court has been clear that the privilege applies regardless of the nature of the matter in which the statement is sought. That's Lefkowitz in 1973, and then more recently in Vega in 2022. It applies in answering official questions put to him in any proceeding, civil or criminal, formal or informal, where there's a potential for self-incrimination. So it doesn't matter if we call it official matter, investigation, or official inquiry. And the corollary to that is here on the phone, it was not an intake, at least here, at Appendix 705, S. D. D. O. White, the same one who was on the phone, she states on direct examination, he was required to report the details of the incident. So that requirement combined with the potential for self-incrimination, and if he doesn't comply with that requirement, then he faces discipline for how he responds. Lastly, before we end.  I mean, I would agree that he created a very difficult situation for himself to resolve, given what occurred. There was a dilemma which under Garrity and similarly under Miranda, those statements are inherently compelled. They can't be used. But Calculus says without the warnings, you can't use them to discipline him. And our argument is regardless of how he responds. If I may make one quick last argument with respect to LaChanze, 1998, I believe by the Supreme Court. Absolutely. Okay. The distinction is critical here. In LaChanze, that was an investigation. There he would have been given Calculus warnings. Here he was not given Calculus warnings. Under Miranda and Garrity, when you look at the reasons why they're inherently compelled and why you can't use them in any capacity, it's because there were no warnings. And that's the distinction here. Okay. Thank you very much. Thank you both counsel. This case is taken on receipt.